Affirmed and Memorandum Opinion filed June 15, 2010.

 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NOS. 14-09-00357-CR

          14-09-00358-CR



 

The State of Texas, Appellant

V.

Troy Mayfield, Appellee

 



On Appeal from the 228th
District Court

Harris County, Texas

Trial Court Cause Nos. 1157810 &
1157811



 

MEMORANDUM  OPINION

 

A jury convicted appellee Troy Mayfield of possession
with intent to deliver cocaine of more than four grams and less than 200 grams
in cause number 1157810; the jury also convicted appellee of possession with
intent to deliver 3,4-methylenedioxy methamphetamine of more than four grams
and less than 400 grams in cause number 1157811.  The trial court assessed
appellee’s punishment at 26 years’ confinement in each cause number to run concurrently. 
Appellee filed motions for new trial.  After holding a hearing, the trial court
granted both motions for new trial.  The State of Texas appeals from the trial
court’s orders granting appellee’s motions for new trial, contending that the
trial court abused its discretion by granting a new trial.[1] 
We affirm.

Background

            At the
guilt-innocence phase of appellee’s trial, the State called Detective David
Kot, a street crime narcotics officer with the Pasadena Police Department, as
its first witness.  Kot testified that, on the evening of March 12, 2008, he
was driving around the area of Richey Road and State Highway 225 — an area of
town known for narcotics activity and prostitution.  At approximately 8:20
p.m., Kot observed appellee driving alone in a white pick-up truck and changing
lanes several times without signaling.  Kot testified that changing lanes
without signaling is a traffic violation that makes the driver subject to being
arrested.  Kot requested a patrol unit to stop appellee for traffic violations
because Kot was driving an unmarked vehicle without emergency lights and was
not in uniform. 

Officer Marco Vela responded to Kot’s request and
pulled up behind appellee’s truck.  Kot and appellee were traveling almost next
to each other because Kot wanted to look inside appellee’s truck to ensure appellee
was traveling alone.  Kot testified that appellee suddenly swerved from the
inside lane into Kot’s outside lane.  Kot had to brake to avoid a collision. 
Officer Vela then turned on his lights and siren and initiated a traffic stop. 
Appellee immediately pulled into the parking lot of a Valero gas station
convenience store.  Kot testified that he observed Vela interacting with appellee. 
After Vela briefly talked to appellee, Vela went to his patrol car, then
returned to appellee’s car; asked appellee to exit his truck; handcuffed appellee;
placed appellee in the back of his patrol car; and arrested him for traffic
violations.  

Kot testified that no more than two minutes elapsed between
the time appellee pulled into the parking lot and the time Vela handcuffed
appellee and placed him in the back of his patrol car.  Kot testified that Vela
requested a wrecker and a canine unit to respond to the scene.  The canine unit
consisting of canine handler Officer Greg Carlson and canine Barry arrived and
Vela left the scene to take appellee to jail.  Kot then exited his car and
observed Barry perform “a smell of the exterior of the vehicle.”  Barry walked
around appellee’s truck and alerted to narcotic odor on the passenger door
seam.  Kot decided to search the interior of appellee’s truck.  Inside the
truck, Kot found a styrofoam food container on the dash board; inside the
container, Kot found a warm bacon cheeseburger and French fries, and two black
magnetic key holders.  One of the key holders contained crack cocaine and the
other contained numerous Ecstasy pills.

Before the trial court allowed the State to introduce
the drugs recovered from appellee’s truck into evidence at trial, the court
gave trial counsel an opportunity to question Kot “regarding the stop” outside
the jury’s presence in light of appellee’s motion to suppress.[2] 
Appellee’s trial counsel filed a motion to suppress which stated that “any
evidence obtained in this case should be suppressed” because “Officers had no
probable cause to search Mayfield’s vehicle because the search was conducted
pursuant to an illegal arrest.”  The motion asserted that the arrest was “illegal”
because appellee “was never taken before a magistrate or given written notice
to appear in court for the traffic violation for which he was arrested.”  

During the hearing outside the jury’s presence, trial
counsel questioned Kot about appellee’s arrest.  Trial counsel asked Kot what
“the proper procedure” is for appellee’s “arrest to be a proper arrest” and if
there is “anything that’s done differently with a  traffic offense arrest other
than a regular arrest.”  Trial counsel also questioned Kot about whether he was
aware that a person who is arrested for a traffic violation must be taken immediately
before a magistrate.  The trial court then interrupted trial counsel and
stated:

THE COURT: Let me interrupt.  All right.  The subject of
the motion to suppression [sic] was probable cause for the stop.  The probable
cause for the stop was a traffic violation.  The subject of the search was
search incident to arrest. And so, I think that at this point I can make a
finding as to whether or not there was probable cause. Because if there’s
probable cause for the stop which led to the arrest, then I can — the law is
pretty clear.

TRIAL COUNSEL: Well, what I’m challenging is the legality
of the arrest, Your Honor, based on failure to follow proper procedure under
Texas law.

THE COURT: Okay.  I don’t know — that doesn’t have any
effect on whether or not there was probable cause.  Probable cause is was there
—probable cause is stated and the testimony is that there was probable cause
for the arrest based on the traffic violation.  At the time that he was
arrested, he was taken to jail?

DETECTIVE KOT: Correct.

THE COURT: All right.  And while he was taken to jail —
well, prior to him being taken to jail, I’m sure his person was searched.

DETECTIVE KOT: Correct.

THE COURT: And in
the process of him going to jail his car was searched.

DETECTIVE KOT: Correct.

THE COURT: And impounded.

DETECTIVE KOT: Correct.

THE COURT: Although you haven’t said that, but I know you
didn’t leave it on the street though.

DETECTIVE KOT: Yes, sir.

THE COURT: Now, whether or not he received a magistrate’s
warning and immediately essentially means as soon as possible.

TRIAL COUNSEL: Right.

THE COURT: Whether or not he received a warning from the
magistrate isn’t going to affect whether or not a police officer had a right to
pull his car over.

TRIAL COUNSEL: No, it’s not going to affect that at all.

THE COURT: Okay. So, that’s — that’s where I am now. Now, I
don’t know the — how we get to any illegal arrest and improper —

TRIAL COUNSEL: An illegal arrest —

THE COURT: — procedure.

TRIAL COUNSEL: Well, an illegal arrest that leads to a
search incident to an arrest makes that evidence illegal.

THE COURT: It wasn’t an illegal arrest.  It was based on
probable cause. If it’s based on probable cause, then it’s square with the
Constitution.

TRIAL COUNSEL: So, I guess what the Court is saying is that
they didn’t follow proper procedure which is mandated by Transportation Code,
that the arrest holds up.

THE COURT: If there’s probable cause, it’s square with the
Constitution. All right.

TRIAL COUNSEL: Okay.

THE COURT: Okay. So, you can make a bill of exception, sir. 
We’ll do that — we won’t do that now.  We can do the bill of exception like
before lunch.  All right.  Where you can ask whatever questions you think are
necessary to complete your record and your objections.  Because I believe that
there’s probable cause for the stop and arrest.  And the search flows from the
probable cause for the arrest.  All right.  It’s just incident from the
arrest.  But on our next break — what we’ll do is we’ll go ahead and take five
minutes for ourselves.  And then on the next break, before you’re excused, sir,
he’ll have an opportunity to make a bill of exception for his record.

DETECTIVE KOT: Yes, sir. 

THE COURT: All right.  Thank you.

After the trial court concluded that probable cause
existed for appellee’s stop and arrest, and that the search was proper incident
to appellee’s arrest, the State resumed the direct examination of Kot in the
jury’s presence:

THE STATE: Before we get back to the two envelopes,
Detective Kot, I want to go back a little bit to something we talked about at
the beginning concerning how you go about doing your job.  

*                                  *                                  *

THE STATE: Is one of the ways that you complete your duties
as an undercover narcotics officer speaking with other people and getting
information?

DETECTIVE KOT: Yes, sir, it is.

THE STATE: Speaking with citizens?

 DETECTIVE KOT: Yes, sir.

THE STATE: Just so the jury is clear, you didn’t just pick
Mr. Mayfield out of a hat that night, did you?

DETECTIVE KOT: No, sir, I did not.

THE STATE: You knew something, didn’t you?

DETECTIVE KOT: Yes, sir.

THE STATE: From a citizen, correct?

DETECTIVE KOT: Yes, sir.

THE STATE: You knew about information and what was inside the
car, didn’t you?

DETECTIVE KOT: Yes, I did.

THE STATE: What specifically did you know?

DETECTIVE KOT: I received information that the defendant would
have black magnetic key holders containing crack cocaine.  

The State then introduced into
evidence the two magnetic key holders Kot recovered from appellee’s truck and
the drugs that were in the key holders. Kot testified that the 34 “off-white-colored
rocks” admitted as State’s exhibit 7 tested positive for crack cocaine.  He
testified that State exhibit 8 was “another black magnetic key holder with . .
. [21] hand pressed tablets, . . . which field-tested positive for Ecstasy.” 
Kot testified that the amount of drugs recovered was valued between $2,000 and
$2,600 and was inconsistent with personal use; the amount was typical for
“mid-level narcotic dealers.”

            Early on during
Kot’s cross-examination, the following exchange occurred:

TRIAL COUNSEL: Now, you just testified that you had
knowledge from an informant that Mr. Mayfield had narcotics in the vehicle?

DETECTIVE KOT: Yes, sir.  I received information from a concerned
citizen stating that a subject named Troy operating a white Ford truck in that
area had a black key holder containing crack cocaine either in or under his
vehicle.

TRIAL COUNSEL: And so, were you like driving around looking
for a white Ford truck or — I mean, how did you know —

DETECTIVE KOT: Yes. That’s why I went to that area.

Trial counsel then questioned
Kot in front of the jury about his experience with hiding drugs in key holders
and why he did not obtain a search warrant to search appellant’s truck: 

TRIAL COUNSEL: If you knew or had gained knowledge or been
told that there could be narcotics in the truck — the vehicle of Mr. Mayfield
and he’s under arrest, which at that point you can search the vehicle, correct?

DETECTIVE KOT: Once the subject is under arrest, we can do
an inventory search and we can do —

TRIAL COUNSEL: Okay. What was the purpose of calling in the
canine?

DETECTIVE KOT:  Just recently after I’d received
information that there may be a magnetic key holder in this vehicle — just
maybe a month prior to that, I had a canine on a call which located a magnetic
key holder under a vehicle, which I wouldn’t be able to find out at the scene,
but a canine can detect it.

TRIAL COUNSEL: Okay.  So, it relates back to the magnetic
key holders?

DETECTIVE KOT: Excuse me, sir?

TRIAL COUNSEL: It relates back to the magnetic key holders —

DETECTIVE KOT: Yes, sir.

TRIAL COUNSEL: — the reason you called the canine?  Okay.  And
were there any — there’s nothing found underneath the vehicle or any other key holders
under the vehicle or —

DETECTIVE KOT:  No, sir.

TRIAL COUNSEL: Only in the bag, correct?

DETECTIVE KOT: In the box, yes, sir.

TRIAL COUNSEL: In the box, right. I’m sorry.  Okay.  If you
know — I mean, is this something that you first encountered?  You said you had
had a previous incident where there was a magnetic key holder, correct?

DETECTIVE KOT: Correct, sir.

*                                  *                                  *

TRIAL COUNSEL: Okay.  And what would be the reason why one
would probably, based on your experience, want to transport narcotics in a
magnetic key holder?

DETECTIVE KOT: So, it can be well-hidden and not in their pockets.

Trial counsel also elicited
more testimony regarding the confidential informant in front of the jury:

TRIAL COUNSEL: Okay. And without revealing any information —
personal information, you say you received your information from a concerned
citizen. 

DETECTIVE KOT: Correct, sir.

TRIAL COUNSEL: Okay.  Not a police officer?

DETECTIVE KOT:  No, sir.

TRIAL COUNSEL: Did you consider that person to be reliable?

DETECTIVE KOT: Absolutely.

TRIAL COUNSEL: Is that based on previous experience with
that person?

DETECTIVE KOT: Yes, it is.

TRIAL COUNSEL: So, let me ask you this, Officer or
Detective Kot: What was the reason why there was no warrant obtained?

DETECTIVE KOT: The information I had was that the subject
had narcotics on him, not that the subject had seen the narcotics.  Had the
subject that called me seen the narcotics, I would have been able to obtain a
search warrant.

TRIAL COUNSEL: But in your work, haven’t you obtained
search warrants based upon reliable information from confidential informants?

DETECTIVE KOT: I have not written — I have not written a search
warrant unless an informant that I had found to be credible and reliable has
personally seen narcotics.  I will not.

TRIAL COUNSEL:  And were you told that this person — person
had seen narcotics in Mr. Mayfield’s vehicle?

DETECTIVE KOT: No, I was — the person told me that he had the
magnetic key holder with crack cocaine in or under his vehicle.  That’s what I
was told.

TRIAL COUNSEL: Do you have any idea how the person knew
this?

DETECTIVE KOT: ‘Cause the person — the person is around the
element the cocaine element — the crack cocaine element.

After trial counsel passed Kot as a witness, he complained
to the trial court outside the jury’s presence about Kot’s testimony regarding
a confidential informant:

TRIAL COUNSEL: During the officer — Detective Kot’s
testimony, it was elicited from him through . . . [the State] that Detective
Kot received a tip from a confidential informant that Mayfield contained narcotics
in his vehicle.  And that’s news to defense counsel.  There’s nothing in the
report that states that.  I would never — had an opportunity to try and have
him reveal that person to me or maybe subpoena or to maybe see if it’s somebody
that’s related to Mr. Mayfield or related to a juror.  I just haven’t had the
opportunity to deal with that.

THE COURT: I’ll let you ask him questions on cross-examination.
 We’ll go from there.

THE STATE: I’m not recalling him, Judge.

THE COURT: I’m sorry?

THE STATE: I’m not recalling him.

THE COURT: Oh, did you already pass him?

TRIAL COUNSEL: Yes, sir.

THE COURT: Yeah, he’s still on —

TRIAL COUNSEL: I passed the witness. Yes, I did.

THE COURT: Oh, you passed the witness.

TRIAL COUNSEL: I didn’t release him, but I passed him, yes.
 But —

THE COURT: Okay. Well, I’ll let you take up that matter
outside the presence of the jury some other time.  You can make your bill.  You
can make a bill and you can make — say what you will.  But at this point, I
don’t know what you — there’s no remedy for me.

The State called Pasadena Police Officer Marco Vela
as its next witness.  Vela testified that he responded to Kot’s request for a
marked unit because he was in the area.  Vela testified that Kot had described
appellee’s vehicle as a white Ford F-150, provided the vehicle’s license plate
information, and advised that appellee was traveling in the inside lane.  When
Vela pulled up behind appellee’s truck, he observed appellee cutting into Kot’s
lane and almost hitting Kot’s vehicle.  Vela testified that, after he activated
his emergency lights, appellee pulled into a gas station.  As Vela approached
appellee’s truck, appellee was looking around nervously.  Vela could smell food
and saw a closed food container “in the middle of the dashboard;” the food
container appeared to be within appellee’s reach.

            Vela testified
that he pulled appellee out of the truck and arrested him because appellee
“kept looking around and looking back” and because he observed a “near
collision;” additionally, Kot had advised him of appellee’s erratic driving
over dispatch.  Vela testified that appellee’s action in looking around made
him nervous because Vela did not know if appellee was expecting someone.  Vela
testified that he took appellee to jail so he could be processed and then
“stand by to speak to the judge in the morning.”

            Pasadena Police Officer
and canine handler Greg Carlson testified that Vela advised him that Kot
requested canine Barry to check the exterior of appellee’s truck for
narcotics.  Barry alerted to the passenger door seam.  

            Claudia Busby, a
senior forensic chemist with the Pasadena crime laboratory, testified that she
field-tested the drugs that were recovered from the magnetic key holders.  She
testified that she only analyzes the narcotics, and she does not test for
fingerprints.

            After the State
rested, appellee took the stand.  He testified that he is self-employed and
runs a successful pressure washing business.  He testified that on March 12,
2008, he was spending time with his children when an acquaintance named Black
called him to ask for a ride.  Black’s car had broken down at his girlfriend’s
apartment and Black needed a ride to the Villa Americana apartment complex at
5901 Selinsky.  When appellee picked up Black from his girlfriend’s apartment
complex, Black asked appellee to stop at the nearby Denny’s so Black could purchase
food.  Appellee testified that Black went to Denny’s and ordered food. 
Appellee remained in the truck to text on his phone and later entered Denny’s
to use the restroom.  When appellee returned from the restroom, Black was still
inside the Denny’s and appellee continued waiting for Black by his truck and
spent his time texting on his phone.  

When Black exited Denny’s, he asked appellee to drive
him back to his girlfriend’s apartment so he could drop off one container of
food for her.  Appellee drove Black to the apartment and told Black that he
would go get gas while Black dropped off the food.  Appellee testified that,
even though a Shell gas station was close to the apartment complex, he wanted
to buy gas at the Valero gas station farther down on Richey Road because gas
was cheaper there.  Appellee testified that he was trying to change from the
inside to the outside lane to turn right into the Valero gas station.  Appellee
admitted he almost had a collision because he was trying to turn right into the
gas station.  Vega then activated his emergency lights, and appellee
immediately turned into the gas station because he had already intended to go
to that gas station.

Appellee testified that Vega told him that he almost
hit another car, so appellee looked around for that car.  Appellee also
testified that he told Vega he needed gas and showed him the fuel tank gauge. 
After appellee gave Vega his driver’s license, Vega handcuffed appellee and
placed him in the back of his police car.  While appellee was sitting in the
police car, Vega checked for outstanding warrants; checked in appellee’s truck
for appellee’s insurance and registration; and conducted a plain view search. 
Vega then told him he was arrested for an illegal lane change.  When appellee
arrived at the jail, he was “booked under a hold for Detective Kot” and only
discovered the next day that he was charged with two counts of possession of
drugs with intent to deliver.

Appellee admitted that he had been nervous because he
had been driving with a suspended driver’s license.  He explained that he
couldn’t get his license reinstated but had to drive his truck to conduct his
pressure washing business.  Appellee testified that he and his wife Pilar owned
the truck and that both he and his wife used the truck — although appellee and
his wife are separated.  Appellee maintained that the drugs found in his truck belonged
to Black.  Appellee also testified that he could not reach the food container
on the dashboard without getting out of his seat because he is only five feet
and seven inches tall.

Appellee testified that, although he had changed his
life, he still had friends and acquaintances who had access to illegal
narcotics because he did not want to “knock them for what they do.”  Appellee
knew Black was selling drugs from time to time.  Appellee testified that,
although he knew Black sold drugs from time to time, he did not know that Black
would bring drugs into his car because he told Black not to bring any; appellee
testified that he did not see any drugs when Black entered his truck.  Appellee
testified [t]hat’s pretty much how I — I have to be.  I have to make sure if I
do pick somebody up, they don’t have any drugs on them.”

Appellee also admitted that he had been convicted of
burglary of a motor vehicle in 1990, of theft in 1990, of two counts of
possession of a controlled substance in 1992, and of delivery of a controlled
substance in 2004.  

On re-direct examination, trial counsel asked
appellee if he had any other drug convictions since 2004; appellee answered, “I
haven’t had any drug convictions or anything else since that time.”  Trial
counsel then stated, “Well, no drug convictions[.]”  The trial court thereupon
asked the State and trial counsel to approach for a bench conference:

THE COURT: Okay.  If you start asking him whether —
questions that relate to whether or not he’s conformed with a certain behavior
or has avoided a certain behavior, then the State can certainly rebut that with
an argument of conformity.

THE STATE: And I have offense reports that he has been
arrested several times since 2004.

THE COURT: So, I’m going to ask the jury —

TRIAL COUNSEL: Well, that’s not a conviction.

COURT REPORTER: I’m having a hard time hearing you.

THE COURT: All right.

THE STATE: He just said in response to the question, I
haven’t been convicted or done anything else like that.

THE COURT: Okay. Hang on, please.  Thank you.  Look, the
question that you asked goes to the issue of whether or not he has — he’s in conformity
with a certain type of behavior.  If you ask that question, the State will have
an opportunity — I will give them an opportunity to rebut it.  What I will do
at this point is I will ask that that question be removed and not considered by
the jury unless you want to proceed down that road.

TRIAL COUNSEL: Well, I just thought — I’m obviously wrong —
that I was just looking at the conviction.  But if it’s going to go to
conformity, I’ll withdraw it.

THE COURT: Okay.  All right.  Thank you.

(End of conference).

THE COURT: Okay.  That last question was withdrawn and the
jury is not to consider the question or speculate as to any answer concerning
that last question.  It’s withdrawn and you’re not to consider it.

 

Shortly thereafter, trial counsel asked appellee,
“Now, why would you — I mean, because you told the jury that you changed your
life.  Why would you drive around on a suspended driver’s license not in
conformance with the law?”  Appellee responded that he “wasn’t able to get” his
driver’s license back and that he needed to drive to conduct his pressure
washing business.  The trial court held the following bench conference:

THE STATE: Judge, he just opened the door regarding
conformity there with — when he specifically asked the question not in
conformity with —

THE COURT: You asked him about changing his life and being
in — and so, I believe you’ve opened the door, but limited. The question is how
far are you.

THE STATE: We have multiple offense reports of multiple instances
of conduct even in the convictions and non-convictions that we want to put on rebuttal
evidence on.  So, would you like to talk about it with them outside the
presence of the jury?

THE COURT: Yes.

(End of conference) 

THE COURT: Okay. I’m going to have to excuse the jury for a
— briefly.

(Jury out).

THE COURT: All right.  Take your seats.  Okay.  The
argument is that the last question opened up the door as to whether or not he’s
been law-abiding.

THE STATE: That’s correct, Judge.  He’s just left the
impression with the jury that since 2004 he’s changed his life and thus has
been conforming with the law but for the fact of driving with a license
suspended.

TRIAL COUNSEL: That’s an incorrect statement.

THE COURT: Well —

THE STATE: That fact is not true, Judge, which then allows
us to go into —

THE COURT: You’ll have an opportunity — one second.  You’ll
have an opportunity to respond, sir.  Okay.  Please continue.

THE STATE: That’s not true since 2004 that Mr. Mayfield has
been in conformity with the law.  We have multiple offense reports and other
instances that we’d be happy to put on in a rebuttal case that completely rebut
the testimony that he just — and the impression that he just left with the
jury.

THE COURT: Okay. What is it — what is the evidence that you
believe is admissible?

THE STATE: [State describes evidence it intends to admit
relating to drugs that were found in places associated with appellee]

THE COURT: All right.  I’m ready to rule.  You know, the
statement essentially was prefaced with you stated [sic] earlier that you
changed your life, then why were you driving with the DW — with a suspended
license.  And that was a statement that was made on direct yesterday, that I
recall.  I don’t recall him saying that today.  But it was again stated in
front of the jury, which could leave an inference that he has been law-abiding
but for the DWLS.  Along with — well, I think the record is clear in regards to
other statements or inferences that could be made on — or that could be left
with in the jury’s mind based on his direct testimony.  And I think that he has
opened the door.  I think that those incidents in 2005, they not only rebut the
inference, but they might very well go to the allegation or to his statement
that he had no knowledge.  And also the fact that he gave a phone call and he
said no drugs around me, no drugs permitted.  It goes on and on. It’s coming
in.

On re-cross examination, the State questioned
appellee regarding other instances when drugs had been found in places to which
appellee had access.  Appellee testified that in April 2005 someone came to his
place of business looking for his “father and for drugs.”  Appellee testified
that he was not present when police arrived to search the business and that the
police called him to the scene after finding cocaine and heroin.  

Appellee also testified that the police executed a
search warrant in May 2006 for a residence his wife, children, and stepson
lived in because they were looking for his stepson.  The police found cocaine,
pills, heroin, and a stolen gun at the residence.  Appellee testified that (1)
he was not present at the time of the search and did not know where the
narcotics were found; (2) he already had moved out of the residence because he
and his wife had separated; (3) mail addressed to him was found at the
residence because his children live at this address so he kept the address as
his mailing address; and (4) he “later testified in front of the grand jury and
was exonerated, cleared.”

Before closing statements, trial counsel made a bill
of exception with regard to his motion to suppress stating that appellee’s
arrest was illegal because appellee was not immediately brought before a
magistrate or released as mandated by the Transportation Code; accordingly, he
contended that the search incident to arrest was illegal.  Trial counsel also
stated that (1) the defense was surprised when the State elicited testimony
that Kot had received a tip from a confidential informant concerning appellee;
(2) the State violated the court’s discovery order by not providing the defense
with any information that a confidential informant had been used in this case
and thereby preventing the defense from discovering the identity of the
informant; and (3) neither Kot’s police report nor the State’s open file
“reveals that Detective Kot had a tip from a confidential informant that led to
the arrest of” appellee.

During closing argument, trial counsel brought up the
fact that Kot testified he received a tip from a confidential informant that
appellee was transporting drugs. Trial counsel questioned why the State did not
call the confidential informant as a witness and questioned whether Black could
have been the informant Kot relied upon.  Trial counsel also speculated whether
Black set up appellee in order to help himself.

The State responded in its closing argument that
Black would not have had enough time to set up appellee.  The State also
claimed that Black is a fictitious person who does not exist because appellee
would have done “everything in his power to get him to court” if Black indeed
existed.  The State also focused on the confidential informant’s tip stating,
“What do we know about the tip Detective Kot received?  ‘Cause it’s very key.
We knew that a white Ford pickup would be carrying crack cocaine and Ecstasy in
black magnetic key holders.  And don’t you know, lo and behold, what do we find
with Mr. Mayfield?  Black magnetic key holders containing crack cocaine and
Ecstasy.  He wasn’t set up.  There wasn’t a setup.”

The jury returned a guilty verdict, and the trial
court sentenced appellee to 26 years’ confinement in each cause number to run
concurrently.  On January 27, 2009, appellee’s appellate counsel filed motions
for new trial in each cause number “based upon Rules 21.3(b) and 21.3(h)” of
the Texas Rules of Appellate Procedure, and based “upon the fact that . . .
[appellee] received ineffective assistance of trial counsel.”  

On February 11, 2009, appellee filed pro se motions
for new trial in each cause number asserting that (1) the trial court erred in
not hearing his motion to suppress before trial began; (2) the trial court
erred by allowing the arrest of appellee “to stand without the police report
for arrest of traffic violation;” (3) the district attorney violated the motion
for discovery by not delivering Brady[3]material
to the defense; and (4) the district attorney violated appellee’s “rights to a
fair trial and due process of law by using testimony evidence regarding C. I.
[confidential informant] that was not in the police report.”

The trial court presiding over appellee’s trial also
presided over the motion for new trial hearing on March 26, 2009.  At the
hearing, appellee’s appellate counsel called trial counsel as a witness; trial
counsel previously had an opportunity to review the trial record.  Trial
counsel acknowledged that before trial he filed a motion to suppress the drugs
found in appellee’s truck and then articulated his argument to the trial court
during trial because his motion to suppress was carried with the trial.  Trial
counsel acknowledged asking the trial court “to find that the officer didn’t
have probable cause to arrest and then subsequently search” appellee’s truck
because of a violation of the Transportation Code “[w]hich would have made the
arrest invalid.”  Trial counsel also acknowledged that the trial court denied
his motion to suppress.

Appellate counsel then read for the record Kot’s
trial testimony regarding the tip he received from a confidential informant and
proceeded to ask trial counsel why he did not “make a proper hearsay objection
before” Kot stated that an unnamed citizen told him appellee “would have black
magnetic key holders containing crack cocaine.”  Trial counsel replied that it
was “imperative that the Court heard the testimony from police officers in this
case regarding their credibility” because “the motion [to suppress] was still
being heard.”  Trial counsel stated: “When the State elicited the information
about a credible witness, in my mind I’m thinking okay, this is new.  This is a
surprise.  I need to object.  I’m also thinking well, you know, we have a
motion to suppress that has a case that stipulates that.  The Court has
discretion to decide whether to suppress the — grant the motion to suppress
regarding whether or not the witnesses in the case for the State or — were credible
or not credible.”

The following exchange occurred between appellate
counsel and trial counsel:

APPELLATE COUNSEL: Do you — do you understand as a lawyer
that before Detective Kot testified in front of the jury as to what this
citizen told him about the defendant carrying crack cocaine in a black magnetic
key holder, that you could have approached the Court and asked the Court to
hold the hearing — motion to suppress — excuse me — outside the presence of the
jury before Detective Kot said what he said about the citizen’s complaint or citizens’
information?  Do you know that?

TRIAL COUNSEL: No.

APPELLATE COUNSEL: Okay.  So, as a lawyer you didn’t know
that you could ask for that?  Is that what you’re saying?

TRIAL COUNSEL: Well, no.  I know I could ask for it.  We
can ask for a lot of things.  That’s not a reason the Court — that doesn’t mean
you’re going to get it.

APPELLATE COUNSEL: I understand.

TRIAL COUNSEL:  But yes, I could have asked for it.

APPELLATE COUNSEL: Okay. And you didn’t ask for it?

TRIAL COUNSEL:  No, I didn’t.

APPELLATE COUNSEL: Okay.  Do you think looking back upon
this case that it would have been a better trial strategy to object to the
hearsay testimony about the citizen saying to Detective Kot that the defendant
had these drugs on him?

*                                  *                                  *

TRIAL COUNSEL:  Yeah.  At any trial I’ve had where there
was not a motion to suppress being heard, I would have immediately objected to
that as hearsay. Not only that, but it’s prejudicial to my client.

APPELLATE COUNSEL: It’s prejudicial to your client because
that is information that links the drugs that were found in the car to Mr.
Mayfield.

TRIAL COUNSEL:  Well, it’s information that does link it to
Mr. Mayfield.  But when you also have the witness stating credible, reliable
informant —

APPELLATE COUNSEL: Yeah —

TRIAL COUNSEL: — I mean, it’s almost like, you know, the error
— the harm for error is caused.  It’s just you can’t get over it.  I mean, it’s
an automatic guilty as far as I’m concerned.

APPELLATE COUNSEL: So, if — and I want you to state your
words.  I don’t want to state your words for you.  Did you have a sound
plausible trial strategy for not objecting to that hearsay testimony?

TRIAL COUNSEL: The only strategy I can offer you is looking
back to Gray V State [sic].  If you read that case, you’ll see where it goes.
And it totally leaves it up to the trial court’s discretion regarding whether
to grant that motion to suppress regarding the witness’ credibility or lack of.

APPELLATE COUNSEL: Aside from the motion to suppress issue,
which you now know that you could have done outside the presence of the jury
and not in front of the jury, aside from that as you’ve very well articulated,
did you have any sound trial strategy for letting Detective Kot or for at least
not objecting to that testimony regarding the citizen saying the defendant had
these drugs on him?

*                                  *                                  *

TRIAL COUNSEL:  Even if I did — I mean, this happened fast. 
So, I had to think on my feet.  I mean, there was never anything mentioned
before in the record or offense report regarding any type of credible, reliable
informant.  So, when this information came up, I saw it as an opportunity that —
you know, for the Court to see that these police officers involved in this case
may not have been very credible.  And that would go back to a basis for
granting my motion to suppress.

APPELLATE COUNSEL: I understand that. But you can do that
outside the presence of the jury.

TRIAL COUNSEL:  Well, that was a decision that I just did
not decide to do.  And that is, ask for a motion outside the presence of the
jury.  We made a decision, an agreement, and that’s the way it went.

APPELLATE COUNSEL: Do you think that there is any — do you understand
that you should have had that hearing outside the presence of the jury?  You
and I have talked about that.

TRIAL COUNSEL: Are you asking me did I think that before
the trial started or during?

APPELLATE COUNSEL: I’m asking you right now, looking back
on it.

TRIAL COUNSEL: Well, looking back on it from what happened
in this trial, I would probably argue for having a motion to suppress outside
the presence of the jury.

APPELLATE COUNSEL: Okay.  And you and I talked earlier also
about that.  And I think you indicated to me that regarding this objection or
this hearsay testimony, because you had the motion to suppress issue so much on
your mind, that you missed — you just missed the hearsay objection on that
issue.

TRIAL COUNSEL: Yes.  Because it weighed on whether or not
it would be better to object or to allow the testimony to come in.  Again,
referring back to Gray V State [sic].

APPELLATE COUNSEL: Explain to me, if you will, and to the
Judge how it is ever better to let in evidence that — for lack of a better term
buries your client on a guilty verdict regarding that testimony — it’s that
strong — versus objecting to it and letting the Judge make a ruling.  Maybe you
can keep it out.  Maybe you can keep the jury from hearing this testimony which
absolutely links the defendant to the drugs.  Explain that to me.

TRIAL COUNSEL:  Explaining now from what I’ve learned from this
trial, I would never say it was better to allow the testimony in.

APPELLATE COUNSEL: Okay.  I’d like to take you now to page —Volume
3, Page 77.  And this is part of your cross-examination of Detective Kot on
Page 77 beginning . . . this is a question by you to Detective Kot.  He’s still
on the stand.  ‘Now, you just testified that you had knowledge from an
informant that Mr. Mayfield had narcotics in the vehicle.’ . . . ‘Answer: Yes,
sir. I received information from a concerned citizen stating that a subject
named Troy operating a white Ford truck in that area had a black key holder
containing crack cocaine either in or under his vehicle.  . . . did you have a sound
plausible trial strategy for cross-examining the police officer on the piece of
evidence that gets the defendant found not guilty? The worst piece of evidence
in the whole case, you brought up in cross-examination. Did you have a reason
why you brought that up again?

TRIAL COUNSEL:  It goes back to what I just stated earlier
about why I didn’t object.

THE COURT: Go ahead and restate it, sir.

TRIAL COUNSEL:  Basically that, you know, I felt like the Court
should see and I think the Court probably could reason that the officers
involved in this case obviously had a pretextural [sic] stop in mind when they arrested
or when they stopped Troy Mayfield.  And that again, I was going through my
case thinking that the whole time, motion to suppress.

APPELLATE COUNSEL:  Do you know that the whole line of
cases regarding pretext stops have been overruled — have been overturned?

TRIAL COUNSEL: Yeah, you’re right.  But I wasn’t arguing a pretext
stop in the motion.

APPELLATE COUNSEL: Okay.

TRIAL COUNSEL: But it doesn’t mean it didn’t happen.

APPELLATE COUNSEL: I understand that.  I understand that.  So,
do you see . . . not only is the officer again reiterating to the jury about
the defendant having drugs, but now he has — upon your cross-examination question
and his answer to your question — has now been allowed to tell the jury a
little bit more?  Now, he even tells the jury that the subject’s first name is
Troy, which now we know that the defendant in this case’s first name is Troy.
And he also adds in that this person Troy is operating a white Ford truck.  That
is something — those two pieces of evidence are now added in front of the jury
upon the answer to your cross-examination question, correct?

TRIAL COUNSEL: Correct.

APPELLATE COUNSEL: Other than what you’ve already
indicated, do you think it helps or hurts your client for the jury now to know
even more information from the — this citizen about Troy operating a white Ford
truck?

TRIAL COUNSEL: Well, that specific line —

APPELLATE COUNSEL: I’m sorry. I wasn’t — I’m sorry.  That
had a black key holder containing crack cocaine in the vehicle.

TRIAL COUNSEL: It definitely hurt.

Appellate counsel also
questioned trial counsel’s trial strategy in further eliciting information from
Kot regarding the confidential informant and his knowledge about the magnetic
key holder’s in appellee’s truck:

TRIAL COUNSEL: The only strategy, Mr. Graber, will be again
trying to show the Court that the police officers involved in this case were
not credible witnesses based on what they put in their offense report, based on
what they testified to, based on what the drug — the traffic stop stated, that
it was a traffic stop or a drug stop, rather.  But he was arrested for a
traffic offense.  It all went back to witness credibility.  I had to deal with
it because I didn’t object to it when initially it was elicited from the State.

APPELLATE COUNSEL: So, because you didn’t — in your trial
your thought process is to go into this again because you realize that you
should have objected to it when it first came up on direct examination?  Is
that what you meant by your answer?

TRIAL COUNSEL: Yes.

APPELLATE COUNSEL: You now realize, I believe — you tell me
if I’m correct — that this whole line of questioning should have been done
outside the presence of the jury.  You should — you realize you should have
done that, correct?

TRIAL COUNSEL: Yes.

Appellate counsel also asked
if there was a reason trial counsel brought up during closing argument Kot’s
testimony that he received a tip from a confidential informant that appellee
had been transporting drugs.  Trial counsel responded, “Yes.  Because I want to
show the jury that the police officers were not credible.  . . . Because it was
a great piece of evidence for” the State and trial counsel believed the State
would stress that evidence in its closing argument to the jury.

On cross-examination at the new trial hearing, trial
counsel testified that only “after the reliable informant was mentioned” did he
develop a strategy about painting Black as the confidential informant.  The
parties then presented argument to the trial court. 

After appellate counsel presented his argument and during
the State’s closing argument, the trial court asked the State, “What other link[s]
besides the statement of the confidential informant that Mr. Mayfield would be
in possession of the magnetic key holder with drugs in it were there?”  The
State replied that appellee admitted picking up Black because Black had car
trouble; driving to Denny’s to buy food; driving Black back to the apartment
complex to allow Black to drop off his girlfriend’s food; driving to a gas
station to get gas; and agreeing to pick up Black again to drive him to another
apartment complex.

The trial court then stated, “another question that I
have is — I don’t see this issue even coming up had the investigating officer
informed the lawyers that there was a confidential informant.”  The trial court
sua sponte called Kot as a witness and, after appellate counsel
questioned Kot, the trial court questioned Kot as follows:

THE COURT: All right. So, when the — when defense counsel
testified that it was true that he did not know of that information until it
came out in the testimony, that would be true to the best of your recollection?

DETECTIVE KOT: Yes, sir.

THE COURT: Okay.  Are you aware that it’s a requirement to
inform both the State of Texas, prosecuting attorneys, and the defense of all
relevant information concerning an arrest?  Are you aware of that?

DETECTIVE KOT: Yes, sir.  All relevant information, yes,
sir.

THE COURT: Okay.  And you’re also aware of the fact that if
you — if the reason you were following Mr. Mayfield that night was based on a
confidential informant, that that would be relevant information?

DETECTIVE KOT:  Yes, I —

THE COURT: Okay.  Because it’s a question that both the
State may have regarding the credibility of that informant as well as the
defense in determining, you know, whether or not that informant would have to
be burned.

DETECTIVE KOT:  Yes, sir.

THE COURT: Okay.  But that’s a decision that I make as a
judge.  You understand that?

DETECTIVE KOT: Yes, sir.

THE COURT: Okay. The — the people that make the arrests —
okay —they don’t make the determination of who or whether or not a confidential
informant will be turned over.  That’s a call that the judge makes.  You
understand that?

DETECTIVE KOT:  Correct, sir.

THE COURT: Okay.  So, you know that even if the
confidential informant is afraid or whatever, that that’s still a call that I
make?

The trial court thereafter announced
that it would not immediately make a ruling and that it would read the cases provided
by appellate counsel and the State.  On March 27, 2009, the trial court signed
an order including both cause numbers stating as follows: “The Defendant’s
Motion for New Trial filed March 27, 2009, is hereby: Granted.”  

The State filed its objection to the motion for new
trial on that same day.  The State claimed that appellee requested a new trial
on the basis of ineffective assistance of counsel.  The State objected to the
trial granting a motion for new trial “on any basis other than that set forth
in Defendant’s timely filed motion” and objected “to any purported oral
amendments to” the motions for new trial “that may have been made during the
hearing for new trial.”

The State recounted that, at the new trial hearing, the
trial court questioned Kot sua sponte about why he “did not include the
hearsay statement and information about the concerned citizen in his offense
report.”  The State also recounted that the trial court “expressed its strong
disagreement with the detective’s decision not to include the information in
the offense report at the conclusion of the detective’s testimony at the
hearing.”  Accordingly, the State objected to the trial court “considering the
detective’s decision not to include information in the offense report as a
basis for the motion for new trial because it was not a ground alleged in the
motion.  Therefore, it would be an untimely amendment as the hearing occurred
outside the 30 days required to amend pursuant to Texas Rule of Appellate
Procedure 21.4(b).”

The State filed a timely notice of appeal.

Analysis

In its first issue, the State argues that the trial
court abused its discretion by granting appellee’s motions for new trial on the
basis of ineffective assistance of counsel because “the record does not support
the trial court’s findings that [trial] counsel performed deficiently or that
prejudice resulted.”  In its second issue, the State contends that the trial
court abused its discretion by granting appellee’s motions for new trial
because “the information appellee claimed was Brady evidence was not
mitigating or exculpatory, he received the information in time and put it to
effective use during the trial, and no prejudice resulted from the late
disclosure.”

A.        Standard
of Review

The granting of a new trial rests within the sound
discretion of the trial court.  Lewis v. State, 911 S.W.2d 1, 7 (Tex.
Crim. App. 1995) (en banc).  An appellate court will reverse the trial court’s
decision only when that decision is so clearly wrong as to lie outside the zone
in which reasonable persons might disagree.  State v. Provost, 205
S.W.3d 561, 566-67 (Tex. App.—Houston [14th Dist.] 2006, no pet.).  An
appellate court is not to substitute its judgment for that of the trial court;
rather the appellate court’s role is to examine the record to determine whether
the trial court granted a new trial without reference to any guiding rules or
principles or, in other words, whether the trial court’s decision was arbitrary
or unreasonable.  See Lewis, 911 S.W.2d at 7; State v. Jones, No.
678-02, 2004 WL 231309, at *8 (Tex. Crim. App. Jan. 28, 2004) (not designated
for publication).  The appellate court is to presume the trial court correctly
granted a new trial, and the State has the burden to establish the contrary.  State
v. Belcher, 183 S.W.3d 443, 447 (Tex. App.—Houston [14th Dist.] 2005, no
pet.).  If no findings of fact or conclusions of law were made by the trial
court, the trial court’s judgment granting a new trial must be upheld if any
appropriate ground exists to support it.  Id.  

The trial court is in the best position to evaluate
the credibility of the witnesses.  Kober v. State, 988 S.W.2d 230, 233
(Tex. Crim. App. 1999); Jones, 2004 WL 231309, at *9.  The trial court
may choose to believe or disbelieve all or any part of the witnesses’
testimony.  See State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)
(en banc); Jones, 2004 WL 231309, at *9.  The role of an appellate court
is limited to viewing the evidence in the light most favorable to the trial
court’s ruling and insuring that the standards used to determine whether
counsel was ineffective are properly applied.  Jones, 2004 WL 231309, at
*9.  We must defer to the trial court’s ruling to the extent that any
reasonable view of the record will support that ruling.  Charles v. State,
146 S.W.3d 204, 210 (Tex. Crim. App. 2004), superseded in part on other
grounds by Tex. R. App. P. 21.8(b) as recognized in Herndon v. State,
215 S.W.3d 901, 905 n.5 (Tex. Crim. App. 2007).

Appellee’s motions for new trial were based on Texas
Rule of Appellate Procedure 21.3, sections (b) and (h).  In his motions,
appellee also alleged that “he received ineffective assistance of trial counsel
pursuant to Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 674, 104
S. Ct. 2052 (1984).”  

The Sixth Amendment right to counsel confers upon a
defendant the right to effective assistance of counsel.  Strickland v.
Washington, 466 U.S. 668, at 685-86 (1984).  It does not confer the right
to perfect counsel.  See Ex Parte Welborn, 785 S.W.2d 391, 393 (Tex. Crim.
App. 1990) (en banc).  The Sixth Amendment “envisions counsel’s playing a role
that is critical to the ability of the adversarial system to produce just
results.”  Strickland, 466 U.S. at 685.  Therefore, the “benchmark for
judging any claim of ineffectiveness must be whether counsel’s conduct so
undermined the proper functioning of the adversarial process that the trial
cannot be relied on as having produced a just result.”  Id. at 686.

Under Strickland, a defendant seeking to
challenge trial counsel’s representation must establish that his counsel’s
performance (1) was deficient; and (2) prejudiced his defense.  Id. at
687; Smith v. State, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009). To show
deficiency, a defendant must prove by a preponderance of the evidence that his
counsel’s representation objectively fell below the standard of professional
norms.  Smith, 286 S.W.3d at 340.  To show prejudice, a defendant must
show there is a reasonable probability that, but for his counsel’s
unprofessional errors, the result of the proceeding would have been different. 
Id.  “‘Reasonable probability’” is a “‘probability sufficient to
undermine confidence in the outcome,’” meaning “‘counsel’s errors were so
serious as to deprive the defendant of a fair trial, a trial whose result is
reliable.’”  Id. (quoting Strickland, 466 U.S. at 687, 694).

In reviewing the trial court’s granting of a motion
for new trial based on ineffective assistance of counsel, we do not apply the Strickland
test in a de novo fashion.  State v. Kelley, 20 S.W.3d 147, 151
(Tex. App.—Texarkana 2000, no pet.); State v. Gill, 967 S.W.2d 540, 542
(Tex. App.—Austin 1998, pet. ref’d).  Instead, we review the trial court’s
application of the Strickland test through the prism of the abuse of
discretion standard.  Kelley, 20 S.W.3d at 151; Gill, 967 S.W.2d
at 542.  We will determine only whether a finding of ineffective assistance of
counsel was clearly wrong and outside the zone of reasonable disagreement so as
to amount to an abuse of discretion.  Kelley, 20 S.W.3d at 151; see Gill,
967 S.W.2d at 542.  

B.        Ineffective
Assistance of Counsel

In its first issue, the State argues that the trial
court abused its discretion by granting appellee’s motions for new trial on the
basis of ineffective assistance of counsel.

The State first contends that trial counsel was not
ineffective for permitting admission of certain extraneous offense evidence “because
appellee’s actions, not trial counsel’s, created the false impression the
prosecution offered the evidence to refute.”  Although trial counsel instructed
appellee to merely answer “no” when asked about any convictions between 2004
and the trial date, appellee did not follow his trial counsel’s instructions
and volunteered that he had not done “anything else.”  The State then
introduced extraneous offense evidence.  The State also argues that the
extraneous offense evidence was admissible to rebut appellee’s defense under
the doctrine of chances.

Second, the State contends that trial counsel was not
ineffective for failing to object to Kot’s recounting of information he
received from a confidential informant because the State did not offer it to
prove the truth of the matter asserted.  The State contends that, even if Kot’s
testimony was hearsay, “hearsay is admissible to address a motion to suppress
evidence;” the State and trial counsel “consensually relitigated the
suppression motion throughout the trial;” and trial counsel’s strategy was to refrain
from objecting to Kot’s testimony so the trial court could evaluate Kot’s
credibility and trial counsel could ask the trial court to reconsider “the
suppression issue at the close of the evidence.”  Additionally, the State
claims that trial counsel’s decision not to object to Kot’s testimony comported
with a plausible trial strategy because trial counsel decided to utilize Kot’s
testimony and argue that Black was in fact Kot’s informant.

Third, the State contends that trial counsel was not
ineffective for failing to request disclosure of the confidential informant
before trial because Kot failed to include any information regarding a
confidential informant in his offense report and trial counsel was therefore
unaware of a confidential informant.  The State further argues that, even if
trial counsel had requested disclosure of the informant during trial, trial
counsel “could not have met the burden to require disclosure of the informant”
pursuant to Texas Rule of Evidence 508.  The State also claims that trial
counsel’s decision not to request disclosure was based “on a plausible strategy
that permitted him to presume before the jury that” appellee’s friend Black
“was the informant, if one existed.”

Finally, the State asserts that appellee failed to show
that he was prejudiced by trial counsel’s alleged deficiencies.  According to
the State, “[t]here is no reasonable probability that the information from the
informant changed the outcome of the trial in light of appellee’s chosen
defense.”  The State further argues that any “prejudicial effect of the
offenses was minimal and unlikely to undermine confidence in the verdict”
because appellee admitted having “three controlled substance convictions,
including a delivery conviction in 2004,” and the “testimony that police found
drugs around him in the past, but that he was not convicted of any offense as a
result, would have far less of a negative impact than his admission to the
three drug convictions.”

1.         Strickland’s
First Prong

The trial court’s order did not state the basis for
granting appellee’s motions for new trial.  At the motion for new trial
hearing, appellate counsel vigorously criticized not only trial counsel’s
inaction in failing to object on hearsay grounds to Kot’s testimony on direct
examination regarding the tip he received from a confidential informant, but
also his action in eliciting on cross-examination more damaging testimony from
Kot regarding specific information he received from a confidential informant. 
Appellate counsel questioned why trial counsel would bring up “the worst piece
of evidence in the case” on cross-examination and then during his closing
argument bring up “again the piece of evidence that really hurts the defendant”
and remind the jury that Kot “had information that Troy Mayfield was
transporting drugs.”

We begin by addressing the State’s contention that
“trial counsel was not ineffective for failing to object to Detective Kot’s
recounting of the information he received from the confidential informant”
because (1) the State did not offer the testimony to prove the truth of the
matter asserted; and (2) even if Kot’s testimony was hearsay, “hearsay is
admissible to address a motion to suppress evidence” and trial counsel’s
decision not to object to Kot’s testimony regarding information he received
from a confidential informant comported with a plausible trial strategy.

To show ineffective assistance of counsel for the
failure to object during trial, a defendant must show that the trial court
would have committed error in overruling the objection.  Ex parte White,
160 S.W.3d 46, 53 (Tex. Crim. App. 2004).  The State contends that Kot’s
testimony was not objectionable hearsay because the State did not offer it for
the truth of the matters asserted; the State contends this testimony was
offered “to explain what drew Detective Kot’s attention to appellee’s vehicle.”

“[T]estimony by an officer that he went to a certain
place or performed a certain act in response to generalized ‘information
received’ is normally not considered hearsay because the witness should be
allowed to give some explanation of his behavior.” Poindexter v. State,
153 S.W.3d 402, 408 (Tex. Crim. App. 2005).  “But details of the information
received are considered hearsay.”  Id.  “The appropriate inquiry focuses
on whether the ‘information received’ testimony is a general description of
possible criminality or a specific description of the defendant’s purported
involvement or link to that activity.”  Id. (quoting Head v. State,
4 S.W.3d 258, 261 (Tex. Crim. App. 1999) (en banc)).  The court also stated: 

Frequently, testimony will have an impermissible hearsay
aspect along with a permissible nonhearsay aspect. Almost always it will be
relevant for a testifying officer to relate how she happened upon the scene of
a crime or accident; thus, it is permissible for her to testify that she was
acting in response to “information received.”  “An arresting officer should not
be put in the false position of seeming just to have happened upon the scene,
he should be allowed some explanation of his presence and conduct.”  The police
officer, however, should not be permitted to relate historical aspects of the
case, replete with hearsay statements in the form of complaints and reports on
grounds that she was entitled to tell the jury the information upon which she
acted.

Id. (quoting Schaffer
v. State, 777 S.W.2d 111, 114-15 (Tex. Crim. App. 1989) (en banc) (internal
citations omitted)).  The court then concluded that a police officer’s
testimony regarding information he received from a confidential informant
constituted objectionable hearsay: “He [the informant] gave me some information
about that residence, the subject in that residence, Poindexter, being in
possession of and selling narcotics.”  Id. (emphasis in original).

Kot testified that he “received information that the
defendant would have black magnetic key holders containing crack cocaine.” 
Kot’s testimony was not merely a generalized description of possible
criminality that explained Kot’s presence in the area and his attention to appellee’s
truck.  Kot revealed specific details of the information from the confidential
informant; he “provided far greater detail than was reasonably necessary to
explain why” Kot decided to follow appellee’s truck.  See Langham v. State,
305 S.W.3d 568, 580 (Tex. Crim. App. 2010).  Kot’s testimony was inadmissible
hearsay and trial counsel should have objected to it.  The trial court would
have committed error in overruling a hearsay objection to Kot’s testimony.

We next address the State’s contention that trial
counsel was not ineffective because his failure to object to Kot’s testimony
regarding information from a confidential informant comported with a plausible
trial strategy.  The State contends that trial counsel did not object because he
(1) “considered the evidence essential to attacking Kot’s credibility” and
“hoped the trial court would change its suppression ruling after learning Kot
did not include the information [about the informant] in his offense report;”
and (2) decided to utilize Kot’s testimony to argue that Black was in fact
Kot’s informant, “which would have explained the specificity of the information
given to police.”

We need not speculate about trial counsel’s strategy because
we have a detailed motion for new trial hearing record before us.  That record
includes extensive testimony from trial counsel regarding his thought process. 


Trial counsel acknowledged that his failure to object
to Kot’s testimony was not based on trial strategy.  Trial counsel admitted
that he was so focused on the motion to suppress that he “missed the hearsay
objection on that issue.”  Trial counsel stated, “At any trial I’ve had where
there was not a motion to suppress being heard, I would have immediately
objected to that as hearsay.  Not only that, but it’s prejudicial to my
client.”  Trial counsel stated that he did not know that he could have asked
the trial court to hold a motion to suppress hearing outside the jury’s
presence.  He then stated that he knew he could have asked for a hearing
outside the jury’s presence but “that doesn’t mean . . . [he was] going to get
it.”

When “no reasonable trial strategy could justify the
trial counsel’s conduct, counsel’s performance falls below an objective
standard of reasonableness.”  Andrews v. State, 159 S.W.3d 98, 102 (Tex.
Crim. App. 2005).  The record demonstrates that trial counsel’s failure to
object to Kot’s objectionable hearsay testimony was not motivated by sound
trial strategy, but instead was attributable to an oversight.  Trial counsel stated
that “the only strategy” for eliciting even more damaging testimony from Kot
regarding information from the confidential informant during cross-examination
and mentioning Kot’s damaging testimony in closing was that trial counsel “had to
deal with it because . . . [he] didn’t object to it when initially it was
elicited from the State.”  Trial counsel admitted that he should have objected
to Kot’s testimony on direct examination.

Trial counsel stated that he had the motion to
suppress on his mind and that “the motion was still being heard during . . .
[Kot’s] testimony.”  However, the trial court had already concluded the hearing
on appellee’s motion to suppress outside the jury’s presence and denied the
motion before Kot testified regarding the informant’s tip.  Therefore, there
was no reason for trial counsel to believe that the motion to suppress was
still being heard and no reason to refrain from objecting to Kot’s hearsay
testimony on direct examination.  Nor was there any reason to elicit more
damaging hearsay testimony about the confidential informant during
cross-examination — testimony that tied appellee to the drugs found in his
truck.  

Even if trial counsel unreasonably believed that the
motion to suppress still was under consideration, eliciting more damaging
hearsay testimony from Kot “to help the trial court evaluate Kot’s credibility
and rule on trial counsel’s motion to suppress” could not comport with reasonable
trial strategy because the evidence trial counsel sought to suppress already had
been admitted during Kot’s direct examination.  

Considering that trial “counsel’s function, as
elaborated in prevailing professional norms, is to make the adversarial testing
process work in the particular case,” trial counsel failed to do so in this
case when he failed to object to Kot’s prejudicial hearsay testimony regarding
information from the confidential informant; elicited more prejudicial hearsay
testimony from Kot regarding information from the confidential informant during
cross-examination; and then elaborated on Kot’s prejudicial hearsay testimony
during closing argument.  See Strickland, 466 U.S. at 690.

Based on the record before us and considering that
the trial court was in the best position to evaluate trial counsel’s testimony
at the motion for new trial hearing, the trial court acted within its
discretion in concluding that trial counsel’s performance was deficient and unsupported
by a reasonable trial strategy.[4]

            2.         Strickland’s Second
Prong

The State contends “there is no reasonable
probability that the information from the informant changed the outcome of the
trial,” and that appellee failed to show that he was prejudiced by trial
counsel’s alleged deficiencies.  In that regard, the State argues that the
following evidence supports the jury’s conclusion that appellee knowingly
possessed the drugs found in his truck: (1) police stopped appellee after he
nearly collided with Kot’s vehicle; (2) appellee was alone in his truck “with a
warm box of food that contained two key holders of narcotics;” (3)
“[a]ppellee’s testimony, as well as his location at the time of arrest, linked
him to the controlled substances;” (4) appellee admitted going to Denny’s,
although he denied purchasing food; (5) appellee’s “story that Black
accompanied him, but just did not happen to be in the vehicle at the precise
moment police conducted the traffic stop because he went into the apartment
complex while leaving his warm food and valuable narcotics in appellee’s truck,
seems far-fetched, at best;” and (6) appellee acknowledged giving Black a ride
“while knowing Black often possessed and sold drugs.”  

The State also argues that there “is no reasonable
probability that the information from the informant changed the outcome of the
trial in light of appellee’s chosen defense” because the information supported
appellee’s “claim that Black set him up by putting the drugs in his truck and
notifying police with great specificity of what they would uncover if they
searched it.”  

In addressing Strickland’s prejudice
requirement, the totality of the evidence before the jury must be considered.  Ex
Parte Ellis, 233 S.W.3d 324, 331 (Tex. Crim. App. 2007).  Each case must be
judged on its own unique facts.  Davis v. State, 278 S.W.3d 346, 353
(Tex. Crim. App. 2009).  “Some errors will have . . . a pervasive effect on the
inferences to be drawn from the evidence, altering the entire evidentiary
picture, and some will have . . . an isolated, trivial effect.”  Strickland,
466 U.S at 695-96.  A prejudice analysis under Strickland is not
identical to an analysis of sufficiency of evidence.  Davis, 278 S.W.3d
at 353.  However, overwhelming evidence of a defendant’s guilt bears on his
claim of prejudice under Strickland’s second prong.  See Strickland,
466 U.S at 696 (“a verdict or conclusion only weakly supported by the record is
more likely to have been affected by errors than one with overwhelming record
support”); My Thi Tieu v. State, 299 S.W.3d 216, 226-27 (Tex.
App.—Houston [14th Dist.] 2009, pet. ref’d).

 

In a possession with intent to deliver case, the
State must prove that the defendant (1) exercised care, custody, control, or
management over the controlled substance, (2) intended to deliver the
controlled substance to another, and (3) knew that the substance in his
possession was a controlled substance.  Tex. Health & Safety Code Ann. §§
481.002(38), 481.112(a), (d) (Vernon 2009); Parker v. State, 192 S.W.3d
801, 805 (Tex. App.—Houston [1st Dist.] 2006, pet. ref’d).  Whether direct or
circumstantial, evidence “must establish, to the requisite level of confidence,
that the accused’s connection with the drug[s] was more than just fortuitous.” 
Poindexter, 153 S.W.3d at 405-06.  If a defendant is not in exclusive
possession of the place where the contraband is found, then additional
independent facts and circumstances must affirmatively link the defendant to
the contraband in such a way that it can be concluded that he had knowledge of
the contraband and exercised control over it.  Id. at 406. 

Possible links include, but are not limited to, the
following: (1) whether the defendant was present when the drugs were found; (2)
whether the drugs were in plain view; (3) the defendant’s proximity to and the
accessibility of the drugs; (4) whether the defendant was under the influence
of drugs when arrested; (5) whether the defendant possessed other contraband or
drugs when arrested; (6) whether the defendant made any incriminating
statements when arrested; (7) whether the defendant attempted to flee; (8)
whether the defendant made furtive gestures; (9) whether there was an odor of
drugs; (10) whether other contraband or other drug paraphernalia was present;
(11) whether the defendant owned or had the right to possess the place where
the drugs were found; (12) whether the place the drugs were found was enclosed;
(13) whether the defendant was found with a large amount of cash; and (14) whether
the conduct of the defendant indicated a consciousness of guilt.  Evans v.
State, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006).

Appellee argues that when Kot’s “hearsay testimony is
removed from the equation, the State’s evidence is remarkably inadequate” to
link appellee to the drugs because (1) appellee “was merely present in the
truck where drugs were found;” (2) there was no evidence that there were drugs
on appellee’s person; (3) there was no evidence that the drugs were “right next
to” appellee in the truck; (4) there was “no forensic evidence, such as
fingerprints, that linked the drugs to” appellee; and (5) “there were no
furtive gestures or movements” by appellee “to show knowledge that the drugs
were in the hamburger bag and that he was trying to hide them from the
officers.”  

Appellee contends that the “information from the
informant completely proved the State’s case by bolstering the fact that Mr.
Mayfield was in a white truck, that there were drugs found in a black magnetic
key holder in the truck, and the fact that the subject of Kot’s investigation
ended up being named Troy, just like Kot said the informant told him.”  Appellee
claims that the State recognized the importance of Kot’s testimony regarding
the informant’s tip and argued that it was “very key” and supported appellee’s
guilt.

Reviewing the State’s contentions in light of the
totality of the evidence, we believe the trial court acted within its
discretion in concluding that appellee was prejudiced by trial counsel’s
deficient performance.

During his direct examination, Kot testified that he
did not “just pick [appellee] out of a hat” on the evening of March 12, 2008. 
Kot testified that he knew “from a citizen . . . about information and what was
inside” appellee’s truck.  Kot stated, “I received information that the
defendant would have black magnetic key holders containing crack cocaine.” 
Trial counsel did not object to this testimony. 

On cross-examination, trial counsel elicited the
following testimony from Kot: “I received information from a concerned citizen
stating that a subject named Troy operating a white Ford truck in that area had
a black key holder containing crack cocaine either in or under his vehicle.” 
He also elicited testimony that Kot drove “around looking for a white Ford
truck” and that he considered the confidential informant to be “absolutely”
reliable based on previous experience with the informant.

Without Kot’s hearsay testimony regarding the
detailed information he received from a confidential informant that appellee
would have black magnetic key holders containing cocaine in his white Ford
truck, the evidence shows as follows.  Kot testified that (1) he was driving in
an area known for narcotics activity and prostitution when he observed appellee
changing lanes without signaling; (2) he requested a patrol unit to stop
appellee for traffic violations; (3) Vela responded to his request to stop
appellee; (4) Vela initiated a traffic stop after he observed appellee swerving
into Kot’s outside lane and arrested appellee 2 minutes later; (5) after canine
Barry performed “a smell of the exterior of the vehicle” and walked around
appellee’s vehicle, Barry alerted to narcotic odor on the passenger door seam;
(6) he located a styrofoam food container containing a fresh cooked bacon
cheeseburger, French fries, and 2 black magnetic key holders with cocaine and
Ecstasy tablets; (7) the amount of drugs found was inconsistent with personal
use and was an amount a mid-level drug dealer would possess; (8) the drugs were
worth around $2,000-$2,600; and (9) no money was seized from appellee and
nothing illegal was found on appellee’s person.

Vela testified that (1) Kot requested a marked unit,
described appellee’s vehicle as a white Ford F-150, and provided the vehicle’s
license plate information; (2) he responded to the request and stopped appellee
after he observed appellee cutting into Kot’s lane and almost hitting Kot’s
vehicle; (3) as he approached appellee’s truck, appellee looked around
nervously; (4) he could smell food and saw a closed food container “in the
middle” of the dashboard, and the food container appeared to be within
appellee’s reach; and (5) appellee’s action in looking around made Vela nervous
because he did not know if appellee was expecting someone so he “pulled him out
of the vehicle” and placed him under arrest.

Canine handler Carlson testified that Vela advised
him that Kot requested canine Barry to check the exterior of appellee’s truck
for narcotics; Barry started the check from the driver’s side and alerted to
“the bottom portion of the passenger side door.”  Senior forensic chemist Busby
testified that she field-tested the drugs found in the key holders but she did
not conduct any testing for fingerprints. 

Appellee took the stand and testified that (1) he was
spending time with his children at his wife’s house when Black called him to
ask for a ride; (2) Black’s car had broken down at his girlfriend’s apartment,
which was approximately seven minutes away from his wife’s house, and Black
needed a ride; (3) when he picked up Black from the girlfriend’s apartment,
Black asked him to stop at a nearby Denny’s so Black could buy food; (4) after
Black bought the food, he asked appellee to drive him back to his girlfriend’s
apartment to drop off one of the two food containers he had bought; (5) while
Black was dropping off the food, appellee decided to buy gas at the Valero gas station
and return thereafter to pick up Black; (6) he tried to change from the inside
to the outside lane to turn right into the Valero gas station when he almost
hit another vehicle and was then stopped by Vela; (7) he was nervous because he
had been driving with a suspended driver’s license; (8) when Vela told him that
he almost hit another car, he looked around for the car that had honked at him;
(9) when Vela arrested him, appellee had only $8 in his wallet; (10) the drugs found
in his truck belonged to Black; (11) he could not reach the food container on
the dashboard without getting out of his seat because he was of short stature;
(12) although he had changed his life, he still had friends and acquaintances
who had access to illegal narcotics and Black was one of these acquaintances;
(13) although he knew that Black sold drugs occasionally, he did not see any
drugs when he picked up Black and he did not know Black would bring drugs into
his car because he told Black not to bring any; (14) he had been convicted of
burglary of a motor vehicle, of theft, of two counts of possession of a
controlled substance, and of delivery of a controlled substance but he had since
then changed his life; and (15) he made two attempts to locate Black, but he
did not attempt to subpoena Black because he knew Black would not come to
court.

The jury also heard about two instances in which
drugs had been found in places to which appellee had access.  Appellee
testified that in April 2005 someone came to his place of business looking for
his “father and for drugs.”  Appellee testified that he was not present when
the police arrived to search the business and that the police called him to the
scene after finding cocaine and heroin.  Appellee also testified that the
police executed a search warrant in May 2006 for a residence his wife,
children, and stepson lived at because they were looking for his stepson.  The
police found cocaine, pills, heroin, and a stolen gun at the residence. 
Appellee testified that (1) he was not present at the time of the search and
did not know where the narcotics were found; (2) he had already moved out of
the residence because he and his wife had separated; (3) mail addressed to him
was found at the residence because his children live at this address so he kept
the address as his mailing address; and (4) he “later testified in front of the
grand jury and was exonerated, cleared.”

In addition to the evidence outlined above, trial
counsel brought up Kot’s hearsay testimony and Kot’s receipt of a tip from a
confidential informant that appellee “was transporting drugs” during closing
argument. The State emphasized Kot’s hearsay testimony during its closing
argument: “What do we know about the tip Detective Kot received?  ‘Cause it’s
very key.”  The State continued: “We knew that a white Ford pickup would be
carrying crack cocaine and Ecstasy in black magnetic key holders.  And don’t
you know, lo and behold, what do we find with Mr. Mayfield?  Black magnetic key
holders containing crack cocaine and Ecstasy.”

Significantly, trial counsel stated at the motion for
new trial hearing that he “felt that things were going in a bad way because of
the information that was related about the confidential informant.”  Trial
counsel stated that eliciting more specific information during
cross-examination about what the informant told Kot “definitely hurt.”  Trial
counsel stated that Kot’s testimony was “prejudicial to [his] client” and also
stated, “I mean, it’s almost like, you know, the error — the harm for error is
caused.  It’s just you can’t get over it.  I mean, it’s an automatic guilty as
far as I’m concerned.” 

We do not believe the untainted evidence was so overwhelming
as to prevent the confidence in the outcome of appellee’s trial from being
undermined on this record.  Kot’s testimony about the detailed information he
received from a reliable confidential informant regarding appellee was
significant in that it established that appellee knowingly possessed the drugs
Kot found in his truck.  The evidence highlighted by the State as establishing
that appellee was tied to the drugs was not strong.  When the trial court at
the motion for new trial hearing asked the State what “other link[s] besides
the statement of the confidential informant that [appellee] would be in
possession of the magnetic key holder[s] with drugs in it” there were, the
State highlighted the following evidence: appellee admitted picking up Black
because Black had car trouble; driving to Denny’s to buy food; driving Black
back to the apartment complex to allow Black to drop off his girlfriend’s food;
driving to a gas station to get gas; and agreeing to pick up Black again to
drive him to another apartment complex.

We also are mindful that the trial court presided
over the entire trial.  The trial observed appellee’s trial counsel, the State,
and, most importantly, the jury during trial.  The trial court saw how the jury
may have reacted after hearing Kot’s testimony and after trial counsel and the
State elaborated on the importance of Kot’s testimony during closing argument.

Given the totality of the evidence, it is not
possible to predict whether the jury as “the factfinder would have had a
reasonable doubt respecting [appellee’s] guilt” without Kot’s admittedly
prejudicial and harmful testimony regarding the confidential informant’s tip that
undoubtedly linked appellee to the drugs.  See Strickland, 466 U.S at
695; Wood v. State, 260 S.W.3d 146, 149 (Tex. App.—Houston [1st Dist.]
2008, no pet.).  We therefore conclude that the trial court acted within its
discretion in determining that appellee met his burden to show there is a
reasonable probability that, but for trial counsel’s deficient performance, the
result of the proceedings would have been different.  See Wood,
260 S.W.3d at 149.  Accordingly, we hold that the trial court acted within its
discretion in granting appellee’s motion for new trial.

Having determined that the trial court acted within
its discretion in concluding that appellee was entitled to a new trial because
he was prejudiced by his trial counsel’s deficient performance in failing to
object to inadmissible hearsay testimony, eliciting more inadmissible hearsay
testimony, and elaborating on the inadmissible hearsay testimony during closing
argument, we need not resolve whether other instances of allegedly deficient
performance also warranted the granting of a new trial.  Having concluded that
the trial court acted within its discretion in granting appellee’s motions for
new trial based on ineffective assistance of counsel, we need not resolve
whether any alleged Brady violation occurred or warranted a new trial.

Conclusion

We affirm the trial court’s order granting appellee’s
motions for new trial. 

                                                                                    

                                                                        /s/         William
J. Boyce

                                                                                    Justice

 

 

 

Panel
consists of Justices Anderson, Boyce, and Christopher. (Christopher, J. sitting
by assignment before her appointment to this Court.)

 

Do
Not Publish — Tex. R. App. P. 47.2(b).

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 









[1]
The State is entitled to appeal a trial court’s granting of a motion for new
trial.  Tex. Code Crim. Proc. Ann. art. 44.01(a)(3) (Vernon 2006).





[2]
The motion to suppress was hand-delivered to the State on January 22, 2009; the
motion to suppress was file-stamped on January 23, 2009 with the Harris County
District Clerk.  It is undisputed that the motion to suppress was before the
court at the time of trial and, more specifically, at the time of Kot’s
testimony.  Trial counsel acknowledged that he filed a motion to suppress
before the beginning of trial.





[3]
Brady v. Maryland, 373 U.S. 83 (1963).





[4]
The State also argues that the trial court abused its discretion in granting
appellee’s motion for new trial because trial counsel was not deficient for (1)
permitting the admission of certain extraneous offenses “because appellee’s
actions, not trial counsel’s, created the false impression” which allowed the
State to introduce evidence to refute the impression, and the extraneous
offenses would have been admissible under the doctrine of chances; and (2)
failing to request disclosure of the confidential informant because trial
counsel “could not have met the burden to require disclosure of the informant”
pursuant to Texas Rule of Evidence 508.  However, if we determine that trial counsel’s
performance was deficient for (1) failing to object to objectionable hearsay;
(2) eliciting damaging hearsay; and (3) elaborating on damaging hearsay
testimony again in closing argument without a reasonable trial strategy, we
need not address whether other instances of allegedly deficient performance
also warrant the granting of a new trial.